**Opinion issued December 7, 2023**



In The

# Court of Appeals

### For The

# First District of Texas

_____

### NO. 01-23-00479-CV

_____

## IN THE INTEREST OF D.V., N.V., V.V., D.V., AND M.D.V., CHILDREN

---

### On Appeal from the 314th District Court
### Harris County, Texas
### Trial Court Case No. 2022-00583J

---

### MEMORANDUM OPINION

In this accelerated appeal, Father[1] challenges the trial court's order terminating his parental rights to his children, "Damon," "Nelson," "Virginia,"

---

[1] The trial court's order also terminated the parental rights of Mother; however, she is not a party to this appeal.

"Daphne," and "Mel."[2] In his sole issue, Father contends that the evidence is both factually and legally insufficient to support the trial court's finding that the termination of his parental rights is in the best interest of the children. We affirm.

## Background

This appeal concerns five siblings: Damon, born September 2013; Nelson, born September 2015; Virginia, born November 2018; Daphne, born May 2020; and Mel, born August 2021.

### A.    The Department's Removal of the Children

On April 6, 2022, the Department of Family and Protective Services (the Department) received a referral alleging neglectful supervision of the children. Earlier that day, police officers had arrived at a motel and observed Mother attempt to flee.[3] Officers caught and arrested Mother, who appeared to be under the influence of drugs. Father was found in the motel room asleep with all the children in the room. Upon identifying Father's name, officers discovered a Child Protective Services alert for Father. When officers entered the motel room, they observed a two-year-old child walking on top of a dresser and other children wearing soiled diapers. The children appeared unclean and had bruises on their bodies and faces.

---

[2]    We refer to the parties using the pseudonyms adopted by the parties. *See* TEX. R. APP. P. 9.8(b)(2).

[3]    The record does not indicate the basis for the officers' presence at the motel.

At the scene, officers arrested Father for possession of a controlled substance. Mother was taken to the hospital, where she tested positive for opiates and amphetamines.[4] Upon her discharge from the hospital later that day, officers arrested Mother for failing to identify herself to a peace officer and evading arrest. Both Mother and Father admitted to daily heroin and methamphetamine use. Mother admitted to using every two to three hours, and Father admitted to using every eight hours.

The children were also taken to a nearby hospital for evaluation. Though the others were quickly released, Virginia was transferred to another facility for placement of a feeding tube and further treatment following findings of hypothermia, dehydration, and hypoglycemia. At that time, Mother reported that Virginia was also epileptic and had a genetic disorder.

On April 7, 2022, the Department filed its Original Petition for Protection of a Child for Conservatorship and for Termination in Suit Affecting the Parent-Child Relationship, and the trial court signed an order placing the children in the Department's conservatorship on an emergency basis the same day. Damon, Nelson, Daphne, and Mel were eventually placed together in a foster home. Due to her ongoing medical needs, Virginia was placed in a separate foster home.

---

[4] The record is silent as to the reason for Mother's admission to the hospital.

**B.     Subsequent Proceedings**

The trial court then held a full adversary hearing on April 21, 2022 pursuant to Texas Family Code section 262.201. Following the hearing, the trial court signed a temporary order continuing the conservatorship and instructing Father to comply with the Department's family service plan.

Father's family service plan was admitted into evidence at trial. The plan required that he: (1) maintain stable housing and employment for six months; (2) participate in a six to eight-week parenting course until successfully discharged; (3) build a social support system, including positive family, friends, and social groups; (4) refrain from criminal activity; (5) maintain contact with the Department; (6) complete a psychosocial assessment; (7) complete a psychiatric assessment; (8) complete a substance abuse assessment; and (9) establish a "positive in-home network" including "positive relatives to provide support."

Following a permanency hearing on September 15, 2022, the trial court issued an order containing its findings, including that Father posed a continuing danger to the health or safety of the children and that returning the children to Father was contrary to their welfare. The trial court also found that Father had not demonstrated adequate and appropriate compliance with the Department's family service plan.

As detailed in a subsequent guardian ad litem (GAL) report admitted at trial, Father first responded to the Department's efforts to contact him in December 2022.

The GAL reported that Father attended the nine-month family group conference by phone on January 6, 2023. During the conference, Father reported that he entered an addiction treatment center in October 2022, where he spent fourteen to fifteen days in detox, followed by twenty-six days in recovery. The GAL stated that Father had otherwise failed to comply with his family service plan. Further, the GAL's report noted that on December 27, 2022, Father's hair follicle test was positive for methamphetamines. His urinalysis was negative. Father also reported that he has used methamphetamines and cocaine for over ten years. Father stated that to maintain his sobriety, he kept busy by longboarding, playing basketball, and going on walks. Father was unable to provide the date his sobriety began. When asked about the day-to-day life of his children prior to their removal, he refused to answer. He ultimately left the conference call prior to its conclusion.

The trial court conducted another permanency hearing on February 16, 2023, and for the first time, Father appeared in person. In its subsequent written findings, the trial court found that Father had not demonstrated adequate and appropriate compliance with the family service plan and that returning the children to Father's home would not be in their best interest. However, the trial court ordered that visitation with Father begin upon the recommendation of the children's therapist.

The GAL's March 16, 2023 report, admitted into evidence, again recommended that the children remain in their current foster placements. Regarding

5

Father, the GAL noted that Father testified at the February 16, 2023 hearing[5] that he was attending Alcoholics/Narcotics Anonymous but did not have a sponsor. Though he testified that he was on the "first step," he could not articulate this step. He stated he helped Mother deliver all five of his children but Damon, but he could not correctly state their dates of birth. He stated that he did not seek any medical attention for the children after their births (at least three were born at home).

Regarding the children, the GAL reported that at their last visit, Damon stated that he was "very lucky to be in this home" and was "excited to tell this GAL about a recent family vacation." She noted that Nelson's "activity level and mood have exponentially improved since he has been in [his foster] placement." Daphne "told this GAL with excitement" that she had recently visited "Gogo," her foster parent's mother, and liked her "big dog." The GAL observed she and Mel both appeared "very bonded" to their foster parents. She again noted that both younger children continued to reach normal developmental benchmarks. As for Virginia, who remained in her medical needs foster placement, the GAL noted that she continued to be assessed for potential blindness and deafness, still received in-home nursing care, physical therapy, occupational therapy, and speech therapy, and had several upcoming appointments with her various specialists.

---

[5] The appellate record does not include a transcript from these proceedings.

## C.    Trial

A bench trial began on April 20, 2023 and continued on May 4, 2023. The trial court heard testimony from the following witnesses: (1) caseworker Kyle Sanders; (2) GAL Gina Holder; (3) GAL Laurel Burrin; (4) the foster father for Damon, Nelson, Daphne, and Mel (Foster Father); and (5) Father.

### 1.    Caseworker Sanders

The trial court first heard testimony from Kyle Sanders, the Department caseworker assigned to the children's case. Sanders testified that Damon, Nelson, Daphne, and Mel were currently placed together in a foster home, while Virginia was in a separate, medical needs foster home. Sanders testified that Damon, age nine, was in second grade and "doing very well." Both Damon and Nelson attended one-hour weekly therapy sessions at school. Sanders stated that the foster parents were able to address all of Damon and Nelson's physical and emotional needs, that the placement was appropriate, and the foster parents were willing to adopt them. Regarding the two youngest children, Daphne (age two) and Mel (age one), Sanders testified that they were meeting their milestones and were bonded to each other. He stated that Daphne did not have any special needs and was up to date on her immunizations and pediatric appointments. The four children had visits with their sister, Virginia, and were able to appropriately interact with her.

Regarding Virginia, Sanders testified that the Department placed her in a separate foster home due to her medical conditions, which include a genetic disorder, epilepsy, involuntary movements, and difficulty swallowing which necessitates a feeding tube. At the time of trial, her foster family was able to meet her needs and desired to adopt her. Sanders stated that at the time of removal, Virginia's parents were not caring for her appropriately and she was "near death." The parents did not take her to her medical appointments or address her medical needs. He explained that she was found at a hotel, was malnourished, and required a feeding tube. She was placed in a hospital until her medical needs foster home was available. In the hospital, Virginia was diagnosed with bilateral pneumonia and sepsis.

Sanders testified that the Department had been unable to interact with Mother and Father to help them understand their children's needs. Specifically, Father did not contact the agency until December 2022, though the Department made attempts to locate him each month prior to December 2022. Ultimately, Sanders testified that the Department had an incorrect date of birth for Father. Sanders stated that Father had not had any visitation with his children. Initially, the Department could not locate him. Following the February 2023 hearing, Father was denied future visits due to allegations of prior drug use in the children's presence, and concerns of ongoing drug use. Sanders testified that Father had tested positive for methamphetamines in January or December. He also recalled that Father tested

8

positive for acetylmorphine, which he understood to be heroin.[6] When Sanders discussed this with Father, he denied using heroin for many months. Father reported to Sanders that he had not used heroin since October 2022. He told Sanders that he used heroin after the removal of his children because of addiction. Father reported that he and Mother used meth together, but he had not used drugs with her since the removal.

Sanders and Father discussed his family service plan in February 2023. Father reported ongoing addiction but stated that he had not used drugs since attending rehab in October 2022. Sanders confirmed that Father attended rehab when Father presented him with a certificate of completion for a 30-day inpatient program. Sanders did not attempt to get any further information from the facility about Father's treatment.

Sanders testified that after rehab, Father participated in a substance abuse assessment, which recommended: intensive outpatient treatment; Alcoholics Anonymous or Narcotics Anonymous weekly; obtaining a sponsor; psychiatric treatment, with medication, if necessary; individual counseling; refraining from illegal activity; parenting classes; and stable employment. Sanders stated that at the time of trial, Father was in jail following arrest for possession of a controlled

---

[6] According to hair specimen drug test results admitted at trial, Father tested positive for "6-acetylmorphine" in February 2023.

substance, evading arrest, and unauthorized use of a motor vehicle. Sanders stated that Father could not complete the recommended services while in jail, nor did he believe Father could be employed while in jail. Sanders testified that though Father presumably knew he was facing these charges because they were "old previous charges," Father did not disclose the charges to Sanders or the Department when they discussed the family service plan. Sanders attempted to set up the services for Father, but the providers were unable to contact him after he was arrested. Sanders only learned of Father's arrest after running a background check. Sanders testified that Father had not been convicted of those charges. Prior to these charges, Father's most recent conviction was in 2004.

Sanders testified that he did not visit Father's home before Father went to jail; therefore, Sanders did not know whether it was suitable or safe for the children. Sanders was likewise unable to verify Father's employment and was not aware that he had been working cutting hair. Sanders testified that Father was only able to complete the substance abuse assessment before he returned to jail—he did not complete any other services required by the Department's family service plan. Though Father expressed a willingness to complete the recommended services, and Sanders explained to him the importance of doing so to regain possession of his children, Father tested positive for drugs following drug treatment. Before Sanders could get Father scheduled for his substance abuse group and individual counseling,

10

Father returned to jail. Sanders testified that the fact that Father continued to engage in drug use after the filing of the termination case was "concerning" to him because Father could be impaired and unable to care for his children.

Sanders stated that Father asked about the well-being of his children and his ability to see them during the previous court session. Father did not provide Sanders with any possible relative placements for the children, and no relatives or family friends had come forward to request placement of the children. He stated that from speaking with the children, they were "very happy in their current placement." He acknowledged that Virginia was unable to express her desires but was "doing very well" in her foster home. Sanders stated that all her needs were being met, and he had no concerns about the foster family's ability to keep up with her numerous medical appointments. Sanders noted that the two foster families did a "good job" in making sure the siblings remained in contact. He explained that Damon and Nelson were very worried about Virginia because they often served as her caretakers. Sanders testified that Damon and Nelson were very happy once they saw that Virginia was doing well.

Sanders opined that Father could not meet the children's emotional and physical needs. He also expressed concern that Father would expose the children to dangerous individuals or environments and risk their safety through his drug use. He described their current placements as "safe and stable."

Sanders noted that prior to their removal from the motel, the children had not been in school. He testified that they had "made leaps and bounds" in their education after being placed in foster care. Sanders stated that Father has not demonstrated the parental abilities necessary to care for the children. Further, he did not attend the parenting classes required by his family service plan.

Sanders acknowledged that the Department's goal is always reunification of children and parents; however, in this case, he recommended that Father's parental rights be terminated because the foster parents desired to keep the children permanently, and this was in their best interest.

## 2. GAL Holder

The trial court also heard testimony from GAL Gina Holder, the GAL for Damon, Nelson, Daphne, and Mel. She testified that although Mother and Father were unable to meet their needs, following removal, the children were "doing wonderful." Holder noted that the children were attending therapy and progressing. She recommended that they remain in their current placement and that Mother and Father's rights be terminated so the foster parents could adopt them. Holder testified that this would be in the children's best interest because they were thriving in their placement and had bonded with their foster parents. She explained that now, the children "know what it's like to have a meal, every meal" and "know they are going to get fed." She noted that they had a place to sleep, toys, and referred to their

12

"forever Dad," "Dada," and "forever home." The children were happy in school and with daily structure and routine.

GAL Holder testified that she met with Father in jail. He expressed to Holder that he would have difficulty caring for Virginia due to her special needs.

### 3.    GAL Burrin

GAL Laurel Burrin testified concerning Virginia's placement. She testified that she believed Virginia's foster placement was meeting all her needs. She explained that Virginia's condition had improved significantly following her removal from her parents. Burrin testified that the first time she saw Virginia in the hospital, she weighed eighteen pounds. She could not move or hold her head up, even though she was three years old. She recalled that Virginia was diagnosed with a seizure disorder and pneumonia, was dehydrated, malnourished, and had a generalized developmental delay. Initially, Virginia's medical team was unsure if she could see or hear. Burrin testified that a recent test determined that Virginia had full hearing.

Burrin described Virginia's therapeutic needs, stating that she was trying to learn to stand up and walk and was still experiencing small seizures. Burrin testified that at the time of trial, Virginia weighed 38 pounds and "look[ed] like a 4-year-old," not a baby. She noted Virginia was able to move, and her hair was growing back. Burrin recommended termination of Mother and Father's parental rights so

that Virginia could be adopted by her foster family. She believed this was in Virginia's best interest, given the lack of medical attention she received with Mother and Father. She testified that the foster family not only met her medical needs, but also her emotional needs. Burrin noted that Virginia had foster siblings in the home and that this was important to her emotional well-being, as were continued visits with her biological siblings.

### 4. Foster Father

The trial court also heard testimony from the foster father for Damon, Nelson, Daphne, and Mel. Foster Father testified that the children have expressed a desire to remain in the foster home and confirmed that he was willing to adopt the children if permitted. He explained that the children are bonded with his extended family and friends. Foster Father testified that they endeavored to schedule a visit with Virginia every other week, depending on her health. Additionally, Virginia is included in holiday and birthday celebrations. Foster Father stated that Damon reported trying to care for Virginia by giving her food and, out of all the children, he has shown the most worry about her.

Foster Father also testified about an incident that occurred when they took the children to a hotel on a family trip. When Daphne misbehaved, Foster Father placed her in timeout. He testified that Nelson then asked why he did not put Daphne in a

closet, because, in Nelson's words, "that's what [his] bad dad would do to [them] whenever [they] would get in trouble."

Foster Father testified that the children had demonstrated improvement emotionally, physically, and academically, following their placement in his home.

### 5. Father

Lastly, the trial court heard testimony from Father, who acknowledged his paternity of all five children. At the time of trial, Father was incarcerated. He testified that he was arrested for possession of a controlled substance at the time of the children's removal. He had not yet been convicted and stated his intention to take that case to trial. Father testified that he had two other pending charges relating to conduct occurring in 2021. Before that, the last time Father was convicted of a crime was approximately twenty years prior. Father acknowledged his history of addiction and trauma as a child. Father testified that he went to rehab on October 12, 2022 and provided proof of substance abuse treatment to the Department.

Regarding his living arrangements, Father testified that before he was incarcerated, he had a home. He stated that he invited the GAL to visit his home, but no one came. He testified that upon release, he had a safe and stable home with a girlfriend. He stated that they were renting the home but only his girlfriend was paying the rent. Father testified that after completing rehab, he worked cutting hair, but admitted he could not show any documentation of his income. Father stated that

15

if he is released, his plan is to "get [his] kids and go back to doing what I was doing; cutting hair, being sober." Father testified that he loved his children very much and asked the trial court not to terminate his rights to them. He claimed he made a mistake with drugs but was doing better.

On cross examination, Father testified that Daphne, Mel, and Nelson were born at home, but Damon and Virginia were born in hospitals. He claimed that Mother did not want to deliver Daphne, Mel, and Nelson in the hospital "because of the pandemic and the shots and all that," so he delivered them at his apartment. He later acknowledged that only Mel was born during the pandemic. He denied seeking medical treatment for Daphne, Mel, or Nelson after their home births because "[t]hey didn't need any" and were "physically okay." Father could not testify as to their exact dates of birth. He never obtained birth certificates for them. He testified that Nelson was currently eight, Daphne was four, and Mel was two years old. Father testified that the other children were "[p]robably watching the projector or playing video games" during the births.

Father could not recall the last time Mother took Virginia to the doctor. He did not know where Mother was and stated that he quit talking to her because she did not want to go to rehab with him. He admitted that they both used heroin and methamphetamines. He denied using drugs in front of the children, testifying that they both used drugs in the bathroom and "kept it clean." He testified that he

16

previously had a home and an apartment, but when his work slowed during the COVID-19 pandemic, "it just got bad real fast."

Father stated that the children were not in school at the time of their removal, but he "[did not] have an answer" when asked why not. Regarding Virginia's medical condition, Father testified that "she wasn't gaining weight with the tube, so [he] would do the keto diet" and try to sit her up and care for her. He disputed that she could not hear or see. He stated that he administered Virginia's medication "all day" and "could barely sleep" as a result. He testified that on the day of removal, he and Virginia "went to sleep at, like, 3:00 in the morning because the medications, like, the last one is at midnight, and we got to do it right at 6:00." He testified that they "were watching Cartoon Network" and "eating brownies." Father stated that he took Virginia's feeding tube out because she was not gaining weight.

Father was then questioned about his drug test results. He testified that he had been sober since October 12, 2022. When asked about the positive test results after that date, he stated that he did not know how he was positive and noted his negative results on a blood test and urinalysis. Father denied that he is unable to parent his children and disputed that the caseworker reviewed the family service plan with him. He claimed he jumped through "[w]hatever hoops [the Department] need[ed] [him] to jump through."

**D.      Termination**

On May 16, 2023, the trial court signed a final decree of termination, finding that clear and convincing evidence existed to support a finding under Texas Family Code sections 161.001(b)(1) (D), (E), (N), (O), and (P), and that termination of Father's parental rights to the children was in their best interests.[7] This appeal followed.

<strong>Best Interests of the Children</strong>

In his sole issue on appeal, Father contends that the evidence is both legally and factually insufficient to support the trial court's findings that termination of his parental rights is in the best interests of Damon, Nelson, Virginia, Daphne, and Mel.

**A.      Standard of Review**

In a case to terminate parental rights under Texas Family Code Section 161.001, the Department must establish, by clear and convincing evidence, that (1) the parent committed one or more of the enumerated acts or omissions justifying termination and (2) termination is in the best interest of the child. TEX. FAM. CODE § 161.001(b). The Department must prove both elements—a statutorily prescribed predicate finding[8] and that termination is in the child's best interest—by clear and

---

[7]      The trial court also terminated Mother's parental rights to the children pursuant to Sections 161.001 (D), (E), (N), (O), and (P), and found that termination of Mother's rights to the children was in their best interests.

[8]      On appeal, Father does not challenge any of the predicate findings.

18

convincing evidence. *See id.*; *see also In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012). The Family Code defines "clear and convincing evidence" as "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE § 101.007.

When assessing the legal sufficiency of the evidence in a termination proceeding, we consider all evidence in the light most favorable to the trial court's finding and decide "whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002); *see City of Keller v. Wilson*, 168 S.W.3d 802, 817 (Tex. 2005). We assume that any disputed facts were resolved in favor of the finding if a reasonable factfinder could have done so. *In re J.F.C.*, 96 S.W.3d at 266. When "no reasonable factfinder could form a firm belief or conviction" that the matter on which the Department bears the burden of proof is true, we "must conclude that the evidence is legally insufficient." *Id.* In reviewing the evidence's factual sufficiency, we consider the entire record, including disputed evidence. *Id.* The evidence is factually insufficient if, considering the entire record, the disputed evidence that a reasonable factfinder could not have resolved in favor of the finding is so significant that the factfinder could not reasonably have formed a firm belief or conviction. *Id.*

19

We give due deference to the factfinder's findings, and we cannot substitute our own judgment for that of the factfinder. *See In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). The fact finder is the sole arbiter when assessing the credibility and demeanor of witnesses. *See id.* at 109.

## B.    Applicable Law

Protection of the best interest of the child is the primary focus of the termination proceeding in the trial court and our appellate review. *See In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003). A parent's right to "the companionship, care, custody, and management" of his or her child is a constitutional interest "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59 (1982); *see In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). Accordingly, we strictly scrutinize termination proceedings and strictly construe the involuntary termination statutes in favor of the parent. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985).

There is a strong presumption that the best interest of a child is served by keeping the child with the child's natural parent. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006); *In re D.R.A.*, 374 S.W.3d 528, 533 (Tex. App.—Houston [14th Dist.] 2012, no pet.). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. TEX. FAM. CODE § 263.307(a).

Courts may consider the following non-exclusive factors in reviewing the sufficiency of the evidence to support the best interest finding:

20

(1)     the desires of the child;

(2)     the present and future physical and emotional needs of the child;

(3)     the present and future emotional and physical danger to the child;

(4)     the parental abilities of the persons seeking custody;

(5)     the programs available to assist those persons seeking custody in promoting the best interest of the child;

(6)     the plans for the child by the individuals or agency seeking custody;

(7)     the stability of the home or proposed placement;

(8)     the acts or omissions of the parent which may indicate the existing parent-child relationship is not appropriate; and

(9)     any excuse for the parent's acts or omissions.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). These factors are not exhaustive, and evidence is not required on all of them to support a finding that terminating a parent's rights is in the child's best interest. *Id.* at 372; *In re D.R.A.*, 374 S.W.3d at 533.

In addition, the Texas Family Code sets out factors to be considered in evaluating the parent's willingness and ability to provide the child with a safe environment, including:

(1)     The child's age and physical and mental vulnerabilities;

(2)     Whether there is a history of substance abuse by the child's family or others who have access to the child's home;

(3)   The willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision;

(4)   The willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; and

(5)   Whether the child's family demonstrates adequate parenting skills, including providing the child with minimally adequate health and nutritional care, a safe physical home environment, protection from repeated exposure to violence even though the violence may not be directed at the child, and an understanding of the child's needs and capabilities.

TEX. FAM. CODE § 263.307(b); *In re R.R.*, 209 S.W.3d at 116.

## C.   Analysis

Father argues that the evidence is legally and factually insufficient to support the trial court's best interest finding. Specifically, Father points to his completion of inpatient treatment, lack of any criminal charges for over 19 years prior to his current charges, and the fact that the Department did not visit his home to evaluate his appropriateness or ability to care for his children. He contends that he was "being punished for having an addiction" and was "making an attempt to turn his life around for his [c]hildren."

### 1.   The Children's Desires, Needs, and Proposed Placement

At the time of trial, the children were too young to testify about their desires. Additionally, Virginia is nonverbal. Under such circumstances, the trial court may consider evidence that the children have bonded with the foster family, are well

22

cared for by the foster family, and have spent minimal time with the parent. *In re L.G.R.*, 498 S.W.3d 195, 205 (Tex. App.—Houston [14th Dist.] 2016, pet. denied). Further, courts have recognized children's need for permanence through the establishment of a "stable, permanent home" as the "paramount consideration" in a best interest determination. *See In re M.M.M.*, No. 01-21-00269-CV, 2021 WL 5365102, at *13 (Tex. App.—Houston [1st Dist.] Nov. 18, 2021, pet. denied) (mem. op.) (citing *In re K.C.*, 219 S.W.3d 924, 931 (Tex. App.—Dallas 2007, no pet)). Thus, evidence concerning the present and future placement of the children is relevant to the best interest determination. *See In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002).

Here, Foster Father testified that Damon, Nelson, Daphne, and Mel expressed a desire to remain in his home and had bonded with his extended family. Similarly, caseworker Sanders testified that those children were "very happy in their current placement," and GAL Holder noted that the children used terms like "forever Dad," "Dada," and "forever home" when discussing their foster placement. As to Virginia, though her medical condition prevented her from expressing her desires, both Sanders and GAL Burrin noted she was doing very well in her medical needs foster home and had bonded with her foster family. No witnesses testified that the children were bonded with Father or expressed any desire to remain with him. Further, at the time of trial, Father had not seen the children since their removal in April 2022.

23

In this case, the trial court could reasonably determine that evidence serving as a proxy for the children's desires weighs in favor of termination. *See In re A.J.D.-J.*, 667 S.W.3d 813, 833 (Tex. App.—Houston [1st Dist.] 2023, no pet.) (holding that where child was too young to express desires, desires are neutral as to best-interest finding unless there is circumstantial evidence from which factfinder could infer desires, such as evidence that child had lived with foster mother most of her life, had bonded with her, and was doing well); *see also In re T.G.R.-M.*, 404 S.W.3d 7, 16 (Tex. App.—Houston [1st Dist.] 2013, no pet.) (determining that although child under age two was too young to testify, evidence supported inference he had not bonded with birth mother because she had not cared for him since two months after birth). Further, the stability of the proposed placements for the children also weighs in favor of terminating Father's parental rights. *See Holley*, 544 S.W.2d at 372 (providing courts should consider stability of proposed placement in determining children's best interest); *In re M.B.M.*, No. 01-15-00256-CV, 2015 WL 5076278, at *6 (Tex. App.—Houston [1st Dist.] Aug. 27, 2015, no pet.) (mem. op.) (holding that stability of placement weighed in favor of termination where children were bonded to grandparents, loved grandmother and called her "mommy," and grandmother had been caring for children since removal and desired to adopt them).

## 2. Children's Needs and Parental Abilities of Those Seeking Custody

Concerning Damon, Nelson, Daphne, and Mel, the evidence presented at trial established that their foster family provided for all their needs, including keeping them up to date on medical and dental appointments, getting Damon and Nelson on track in school, ensuring that Daphne and Mel met appropriate developmental milestones, and caring for their emotional well-being. Similarly, testimony demonstrated that Virginia's foster family met her physical and emotional needs. Her caregivers ensured that she attended her numerous medical appointments and therapy sessions, and her GAL observed that her condition improved markedly following her placement—she more than doubled her weight and became more alert and responsive.

In contrast, Father did not demonstrate the ability to parent the children, particularly Virginia, who was described as "near death" at the time of removal. Father removed her feeding tube and attempted to feed her brownies. GAL Burrin testified that Father expressed concern about his ability to care for Virginia, given her medical needs.

Further, evidence presented at trial established that Damon and Nelson, though children themselves, attempted to care for Virginia and their younger siblings. At the time of removal, Father was charged with drug possession and was later incarcerated. He tested positive for drugs even after his completion of a drug

rehab program. Though Father testified that he had a home with a girlfriend, he did not present a lease or other proof of residence. Father testified that he was working cutting hair but acknowledged at trial that he had not provided any documentation of his income. These factors weigh in favor of termination. *Holley*, 544 S.W.2d at 372; TEX. FAM. CODE § 263.307(b).

### 3. Present and Future Emotional and Physical Danger to Children and Stability of Home

A parent's past conduct is probative of his future conduct in evaluating the children's best interest. *See In re O.N.H.*, 401 S.W.3d 681, 684 (Tex. App.—San Antonio 2013, no pet.). A fact finder may infer that past conduct endangering the well-being of a child may recur in the future if the child is returned to the parent when assessing the best interest of the child. *In re D.M.*, 452 S.W.3d 462, 471 (Tex. App.—San Antonio 2014, no pet.).

Here, the trial court heard testimony concerning (1) Father's criminal history, which included charges for possession of a controlled substance, unauthorized use of a motor vehicle, and evading arrest (for which Father was incarcerated at the time of trial); (2) his history of substance abuse; and (3) his positive drug test results after completing a drug rehabilitation program. Caseworker Sanders also testified that he was concerned that Father's drug use could expose the children to dangerous individuals or dangerous environments and risk their safety.

The evidence of Father's drug use, criminal activity, and instability is indicative of the present and future physical and emotional dangers posed to the children. *See Latham v. Dep't of Fam. & Protective Servs.*, 177 S.W.3d 341, 349 (Tex. App.—Houston [1st Dist.] 2005, no pet.) (affirming best interest determination and noting mother's drug use and incarceration "disrupt[ed] any permanency or stability for the children"); *In re N.J.H.*, 575 S.W.3d 822, 834–35 (Tex. App.—Houston [1st Dist.] 2018, pet. denied) (holding that parent's past pattern of drug use weighed in favor of finding that termination was in child's best interest under several *Holley* factors, and was relevant to his parenting abilities, stability of home he would provide, emotional and physical needs of child, and emotional and physical danger in which child would be placed); *In re E.R.W.*, 528 S.W.3d 251, 266 (Tex. App.—Houston [14th Dist.] 2017, no pet.) (noting factfinder can give "great weight" to "significant factor" of drug-related conduct); *In re O.N.H.*, 401 S.W.3d at 684 (stating parent's past conduct was probative of his future conduct when evaluating child's best interest); *see also In re D.M.*, 452 S.W.3d at 471 (stating court may infer past endangering conduct may recur if child was returned to parent for purposes of determining whether termination is in child's best interest). These factors weigh in favor of termination. *See Holley*, 544 S.W.2d at 372; TEX. FAM. CODE § 263.307(b).

## Conclusion

Viewing the evidence in the light most favorable to the trial court's finding, we conclude that the trial court could have formed a firm belief or conviction that termination of Father's parental rights was in the best interests of Damon, Nelson, Virginia, Daphne, and Mel. *See In re J.F.C.*, 96 S.W.3d at 266. Further, in view of the entire record, we conclude that the disputed evidence is not so significant as to prevent the trial court from forming a firm belief or conviction that termination of Father's parental rights was in the children's best interest. *Id.*

We overrule Father's sole issue and affirm the trial court's decree of termination.

Amparo Monique Guerra
Justice

Panel consists of Justices Kelly, Hightower, and Guerra.